## SOUTHERN PAC. R. Co. *v.* ORTON.[1]

### (*Circuit Court, D. California.* December 15, 1879.)

1. SOUTHERN PACIFIC RAILROAD GRANT.
    The road, to aid the construction of which a land grant was made to the Southern Pacific Railroad Company by the act of congress of July 27, 1866, incorporating the Atlantic & Pacific Railroad Company, was intended by congress to be a road connecting with the contemplated Atlantic & Pacific Road at such point on said road, near the intersection of the thirty-fifth parallel of latitude and the eastern line of the state, as the Southern Pacific Railroad Company should deem most suitable for a railroad line from said point of connection to San Francisco ; the said point of connection, and the line of road thence to San Francisco, to be determined and located by the Southern Pacific Railroad Company.

2. LOCATION OF ROAD.
    The line of the road designated on the plat thereof, filed by the Southern Pacific Railroad Company in the office of the commissioner of the general land-office on January 3, 1867, is located in pursuance of the terms of said act of congress, and is properly located under said act.

3. EFFECT OF GRANT AND FILING PLAT.
    The grant made by said act is a *present general* grant of the quantity of land specified in the act; and immediately upon filing the plat, the *general* grant became *specific,* and attached to all the odd sections of land situate within the prescribed limits on each side of the designated line, then owned by the government, to which no other right had attached prior to the filing of said plat.

4. WITHDRAWAL FROM PRE-EMPTION.
    Immediately upon the filing of the plat, the odd sections designated were withdrawn from pre-emption or other disposition, by force of the act itself, *proprio vigore,* without any order of the secretary of the interior, or notice other than that afforded by the filing of the plat itself.

5. SAME.
    The lands having been set apart to aid in the construction of a railroad, and absolutely and unconditionally withdrawn from pre-emption, no pre-emption right could be acquired in them while so situated, even if the grantee at the time was unauthorized under the state law to take a perfect title.

6. POWER OF SECRETARY TO RESTORE LANDS WITHDRAWN FROM PRE-EMPTION.
    The withdrawal of the lands from pre-emption by the statute being absolute and without conditions, the secretary of the interior had no power to repeal or modify the statute, or restore the lands to their former condition. The withdrawal being unconditional by force of the statute, they could only be reopened to pre-emption by statutory authority.

[1] This opinion was filed before commencement of publication of the Federal Reporter, and is now published in connection with the case of Southern Pac. R. Co. v. Poole, *ante,* 451.

7. TITLE OF CORPORATION TO LANDS—TRESPASSERS.

Where a corporation, authorized to receive grants of land for the purposes of the corporation, brings an action against a trespasser to recover possession of lands granted.to it, such trespasser will not be heard to question the title of the corporation, on the ground that it had no authority to take them. This is a question between the state and the corporation.

8. MISUSE OF CORPORATE FRANCHISE.

Whether a corporation has misused or abused its franchise is a question between the state and the corporation, which cannot be raised or litigated in an action between the corporation and private parties.

9. ACT OF APRIL 4, 1870, CONSTITUTIONAL.

The act passed by the legislature of California, April 4, 1870, authorizing the Southern Pacific Railroad Company to change the line of its road, accept the congressional grant of land, and construct its roads as provided in the act of congress incorporating the Atlantic & Pacific Railroad Company, was not passed in violation of section 31, art. 4, Const. Cal., providing that corporations "shall not be *created* by special act, except for municipal purposes."

10. CONSTRUCTION OF STATE CONSTITUTIONS.

The settled rule of construction of state constitutions is that they are not special grants of powers to legislative bodies, but *general* grants of all legislative powers not actually prohibited or expressly excepted. It is equally well settled that the *exception* must be *strictly* construed. The construction is *strict* against those who stand on the *exception*, and *liberal* in favor of the government itself.

11. SAME.

Under the established rule of strict construction, applicable to state constitutions, an act of the legislature should never be declared unconstitutional, unless there is a clear repugnance between the statute and the organic law.

12. ESSENTIAL ATTRIBUTES OF A CORPORATION.

The essence of a corporation consists only of a capacity to have perpetual succession under a special denomination, and an artificial form; and to take, hold, and grant property, contract obligations, and sue and be sued, by its corporate name; and a capacity by its corporate name to receive, and enjoy in common, grants of privileges and immunities.

13. CORPORATION A FRANCHISE.

The right to be a corporation is a distinct, independent franchise, complete within itself, having no necessary connection with other distinct franchises, which are the subjects of legislative grant, and which may or may not be given to corporations once created, as well as to natural persons, as to the legislature may seem advisable.

14. CORPORATE POWERS.

Corporate powers, strictly speaking, are such as are peculiar to corporations, and essential to their being, and not such powers as are usually, or may be, possessed and enjoyed indifferently by corporations and natural persons.

15. CREATION OF CORPORATION.

The creation of a corporation is the bringing into being of an artificial person having the essential attributes of a corporation,—the creation of the distinct and independent franchise called a corporation,—which, when created, has a capacity, among other things, by its corporate name, to receive and enjoy such other franchises, privileges, and immunities, property and rights, as the legislature itself, or other persons, with its permission, may grant to it.

16. FRANCHISES, ETC., GRANTED TO A CORPORATION.

The granting of independent franchises, other than the specific franchise constituting a corporation, and of other privileges and powers, to a pre-existing corporation, are not acts creative of a corporation, but acts regulating the conduct of the existing corporation in its relation to and intercourse with the public and other persons, natural and artificial.

17. CREATION OF CORPORATION.

The giving of authority to change the line of its road to the Southern Pacific Railroad Company, a pre-existing corporation, by the act of April 4, 1870, is not an act creating a corporation, in whole or in part, and is not the creation of a new corporate power.

18. STATE CONSTITUTIONS—SETTLED CONSTRUCTION.

The settled construction of the provisions of a state constitution by the highest court of the state, when not in conflict with any provision of the constitution of the United States, will be adopted and followed by the national courts, whatever their opinion may be as to the correctness of such settled construction.

19. CONFLICTING CONSTRUCTIONS.

In 1863, the supreme court of California construed a provision of the state constitution, which construction remained unquestioned by the courts for 11 years, during which time much legislation of a similar character to that in question, and among it that involved in this case, was had, under which important rights had become vested. In 1874, the supreme court, being differently constituted, overruled the prior decision; three of the six justices who sat in the two cases having taken one view, and three the other. The supreme court is now to be again reorganized, with seven members, only one of whom has considered the question as a member of the court of last resort. *Held,* that the construction is *not settled* within the rule, and the national courts are at liberty to adopt the view which appears to them correct.

20. SOUTHERN PACIFIC RAILROAD COMPANY—AMENDMENT OF ARTICLES OF ASSOCIATION.

Amended articles of association were filed by the Southern Pacific Railroad Company, in pursuance of the provisions of a general act of the legislature of California, passed March 1, 1870, applicable to all corporations before created, or to be thereafter created. *Held,* that if the act of April 4, 1870, is void, the plaintiff had full authority to build the road under said act of March 1st, and the amended articles of association, filed in pursuance of its provisions.

21. JOINT RESOLUTION CONSTRUED.

The "actual settlers," whose rights are directed to be saved by the joint resolution of congress, passed June 28, 1870, are those who had settled before, and who had existing vested rights at the date of the filing of the plat, and not those who afterwards settled upon the land. The latter could acquire no rights. The grant being a present grant, which attached to the specific lands at the date of the filing of the plat, congress could not divest the rights of the plaintiff, which had once vested, under the act, upon the filing of the plat, except by proper proceedings upon failure of defendant to perform the conditions subsequent.

22. CASES DISTINGUISHED.

*Telegraph Co.* v. *Telegraph Co.,* 22 Cal. 398, and *San Francisco* v. *Water-Works,* 48 Cal. 493, considered, and the former approved.

This is an action to recover possession of certain lands situate in Tulare county. The plaintiff claims title under a congressional grant made to aid in the construction of the Southern Pacific Railroad, and a patent issued in pursuance of the grant; and the defendant claims as a pre-emptioner.

The Southern Pacific Railroad Company became duly incorporated under the general statute of the state of California of 1861, providing for the incorporation of railroad companies, (St. 1861, 607,) by filing its articles of association in the office of the secretary of state on December 2, 1865. The act requires, among other things, the articles of association to state "the place from and to which the proposed road is to be constructed, and the counties into and through which it is intended to pass, and its length as near as may be." Id. 608, § 2. It also provides, that, upon filing the articles, the parties named therein "shall be a body politic and corporate, by the name stated in such articles of association, and shall be capable in law to make all contracts, acquire real and personal property, purchase, hold, convey any and all real and personal property whatever, necessary for the construction, completion, and maintenance of such railroad, and for the erection of all necessary buildings and yards, or places and appurtenances, for the use of the same, and be capable of suing and being sued, and have a common or corporate seal, and make and alter the same at pleasure, and generally to possess all the powers and privileges for the purpose of carrying on the business of the corporation that private individuals and natural persons now enjoy." Id. § 3. Section 17, pt. 1, authorizes "such examinations and surveys for the proposed railroad to be made as may be necessary to the selection of the most advantageous route for the railroad." Part 2: "To receive, hold, take, and convey, by deed or otherwise, the same as a natural person might, or could, do, such voluntary grants and donations of real estate, and other property of every description, as shall be made to it, to aid and encourage the construction, maintenance, and accommodation of such railroad." Part 6: "To cross, join, and unite its

railroad with any other railroad, either before or after construction, at any point upon its route," etc.    Part 7: "To change the line of its road, in whole or in part, whenever a majority of the directors shall so determine, as is provided hereinafter; but no such change shall vary the general route of such road, as contemplated in the articles of association of such company."    Part 8: "To receive by purchase, donation, or otherwise, any lands or other property of any description, and to hold and convey the same in any manner the directors may think proper, the same as natural persons might, or could, do, that may be necessary for the construction and maintenance of its road, or for the erection of depots, turn-outs, workshops, warehouses, or for any other purposes necessary for the convenience of such companies, in order to transact the business usual for such railroad companies."    Section 18 is as follows: "If, at any time after the location of the line of such railroad, in whole or in part, and the filing of the map thereof, as provided by this act, it shall appear to the directors of such company that the same may be improved, such directors may, from time to time, alter or change the line in any manner they may think proper, and cause a new map to be filed in the office where the map showing the first location is filed, and may thereupon take possession of the land embraced in such new location, that may be required for the construction and maintenance of such road on such new line, either by agreement with the owner, or owners, of such lands, or by such proceedings as are authorized under the provisions of this act, and use and enjoy the same in place of the line for which the new is substituted; but nothing in this act shall be so construed as to confer any powers on such companies to so change their road as to avoid any point named in their articles of association, except as provided in section 17, subd. 7, of this act."

The said articles of association, filed December 2, 1865, set forth that the corporation was formed "for the purpose of constructing, owning, and maintaining a railroad from *some point on the bay of San Francisco,* in the state of California, and to pass through the counties of Santa Clara, Monterey, San Luis Obispo, Tulare, Los Angeles, and San Diego, *to the town of San Diego,* in said state; thence eastward, *through the said county of San Diego,* to the eastern line of the state of California, there to connect with a contemplated railroad from the eastern line of the state of California to the Mississippi river."    At the time of the formation of this corporation, Kern county did not exist; it having been created out of the southern part of Tulare and the northern part of Los Angeles counties on April 2, 1866.    St. 1865-66, 796. So that a road running through the western portion of Kern county, as it now is, would on December 2, 1865, have run through Tulare and Los Angeles counties; and the Southern Pacific railroad, as now located and constructed, in fact runs through Tulare and Los Angeles counties, as they existed at the time of the filing of said articles of association, and that part of it in the present Kern county at no great distance from the line then contemplated, as, according to the articles, it was to pass out of San Luis Obispo into Tulare and Los Angeles before reaching Santa Barbara, which is not named in the articles, and left to the westward.    At this time, also, no authority had been given by congress for the construction of any railroad from the Mississippi river to the eastern line of the state of California; although the thirty-third and thirty-fifth parallels of latitude had been publicly discussed as probable lines of future railroads, and it was, therefore, uncertain at what point of the line any road to be projected and constructed would intersect the eastern line of the state.

This being the condition of things, congress, on July 27, 1866, passed "An act granting lands to aid in the construction of a railroad and telegraph line from the state of Missouri to the Pacific coast."    14 St. 294.    By the first section, the Atlantic & Pacific Railroad Company was incorporated and author-

ized to construct a railroad from the town of Springfield, in the state of Missouri, to the western boundary line of the state; thence "to the head-waters of the Colorado Chiquito, and thence along the *thirty-fifth parallel of latitude,* as near as may be found suitable for a railway route to the Colorado river, at such point as may be selected by said company for crossing; thence by the most practicable and eligible route to the Pacific." Section 3 provides as follows: "And be it further enacted that there be, and hereby is, granted to the Atlantic and Pacific Railroad Company, its successors and assigns, for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific coast, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores over the route of said line of railway and its branches, every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile, on each side of said railroad line, as said company may adopt, through the territories of the United States, and ten alternate sections of land per mile on each side of said railroad, whenever it passes through any state; and whenever, on the line thereof, the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption or other claims or rights, *at the time the line of said road is designated by a plat thereof,* filed in the office of the commissioner of the general land-office; and whenever, prior to said time, any of said sections or parts of sections shall have been granted, sold, reserved, occupied by homestead settlers, or pre-empted or otherwise disposed of, other lands shall be selected by said company in lieu thereof, under the direction of the secretary of the interior, in alternate sections, and designated by odd numbers, not more than ten miles beyond the limits of said alternate sections, and not including the reserved numbers." 14 St. 295. Section 4 provides that when 25 miles of the road have been completed according to the act, inspected by commissioners, and verified by them to the president, "patents of lands as aforesaid shall be issued to said company, *confirming* to said company the right and title to said lands, situated opposite to and coterminous with said completed section of said road." Section 6 is as follows: "And be it further enacted that the president of the United States shall cause the lands to be surveyed for forty miles in width on both sides of the entire line of said road after the general route shall be fixed, and as fast as may be required by the construction of said railroad; and the *odd* sections of land hereby granted *shall not be liable to sale or entry, or pre-emption before or after they are surveyed except by said company, as provided in this act;* but the provisions of the act of September, 1841, granting pre-emption rights, and the acts amendatory thereof, and of the act entitled 'An act to secure homesteads to actual settlers on the public domain,' approved May 20, 1862, *shall be,* and the same are hereby, extended, *to all other lands* on the line of said road, when surveyed, *excepting those hereby granted to said company.*" And section 18 is as follows: "And be it further enacted that the Southern Pacific Railroad, a company incorporated under the laws of the state of California, is hereby authorized to connect with the said Atlantic and Pacific Railroad, formed under this act, at such point near the boundary line of the state of California, as they shall deem most suitable for a railroad line to San Francisco, and shall have a uniform gauge and rate of freight or fare with said road; and in consideration thereof, to aid in its construction, shall have similar grants of land, subject to all the conditions and limitations herein provided, and shall be required to construct its road on the like regulations, as to time and manner, with the Atlantic and Pacific Railroad, herein provided for."

In pursuance of the third section of the said act of congress, the Southern Pacific Railroad Company filed a plat of the line of railroad adopted by it in the office of the commissioner of the general land-office on the third day of

January, 1867. The line as laid down on the plat filed, commences at a point near the southern end of the bay of San Francisco, and passes through the counties of Santa Clara, Monterey, Fresno, Tulare, Los Angeles, (as the counties of Tulare and Los Angeles were constituted when the company was incorporated,) and San Bernardino to the Colorado river, to a point on the river near where the thirty-fifth parallel of latitude crosses said river; thus passing through all the counties named in the certificate of incorporation except San Luis Obispo, which was avoided by a deflection to the eastward, and San Diego, which the line did not go far enough south to reach. The deflection carried the line through Fresno and San Bernardino, instead of San Luis Obispo and San Diego counties, but it passes through all the other counties named in the articles of incorporation. The northern portion of Los Angeles county through which the line passed, as the county was constituted at the date of filing the articles of association, is now the southern part of Kern county. Before the filing of said plat the road had not been finally located, and no map or profile thereof had been filed in the office of the secretary of state of the state of California, as provided by section 43 of the act under which it was incorporated, (St. 1861, 623;) the only designation at the time being that indicated in the articles of incorporation hereinbefore set out.

On March 22, 1867, an order was issued from the general land-office withdrawing from market the odd sections of land lying along the route indicated by said map, filed January 3, 1867. On July 14, 1868, the secretary of the interior revoked the order of withdrawal. On August 14, 1868, the secretary suspended said revoking order of July 14th. On November 2, 1869, he revoked said suspension of August 20th. On November 11, 1869, he confirmed his order of November 2d, and ordered the lands restored to market after 60 days' notice. On December 15, 1869, he again ordered that this restoration should be suspended, which last order has never been revoked. Under these various orders of the secretary, the lands have never been actually restored to the public lands, as the order issued for such restoration was in every instance revoked before the expiration of the time when it was to take effect.

. On July 25, 1868, congress passed an act extending the time within which the Southern Pacific Railroad Company should be required to complete the first 30 miles of its road, and requiring it thereafter to complete 20 miles each year till the completion of the road within the time required. 15 St. 187. On June 28, 1870, congress passed a joint resolution, as follows, to-wit: "That the Southern Pacific Railroad Company of California may construct its road and telegraph lines, as near as may be, on the route indicated by the map filed by said company, in the department of the interior, on the third day of January, 1867; and upon the construction of each section of said road, in the manner and within the time provided by law, and notice thereof being given by the company to the secretary of the interior, he shall direct an examination of each such section by commissioners to be appointed by the president, as provided in the act making a grant of land to said company, approved July 27, 1866, and upon the report of the commissioners to the secretary of the interior, that such section of said railroad and telegraph line has been constructed as required by law, it shall be the duty of the said secretary of the interior to cause patents to be issued to said company for the sections of land coterminous to each constructed section reported on as aforesaid, to the extent and amount granted to said company by the said act of July 27, 1866, expressly saving and reserving all the rights of actual settlers, together with the other conditions and restrictions provided for in the third section of said act." 16 St. 382.

On March 3, 1871, congress passed the act to incorporate the Texas Pacific Railroad Company, in which it authorized the plaintiff, the Southern Pacific Railroad Company, to construct a line of railroad from a point at or near Te-

bachapa pass, by way of Los Angeles, to the Texas Pacific Railroad, at or near the Colorado river, with the *same rights, etc., as given to it by the act organizing the Atlantic & Pacific Railroad Company.* 16 St. 573.

On March 1, 1870, the legislature of California passed a general act authorizing any corporation organized or to be organized under the laws of the state to amend its articles of association, by making and filing amended articles in the same office where the originals are to be filed. St. 1869–70, 107.

On April 4, 1870, the legislature of California passed an act as follows: "Whereas, by the provisions of a certain act of congress of the United States of America, entitled 'An act granting lands to aid in the construction of a railroad and telegraph line from San Francisco to the eastern line of the state of California,' approved July 27, 1866, certain grants were made to, and certain rights, privileges, powers, and authority were vested in and conferred upon, the Southern Pacific Railroad Company, a corporation duly organized and existing under the laws of the state of California; therefore, to enable the said company to more fully and completely comply with and perform the requirements, provisions, and conditions of the said act of congress, and all other acts of congress now in force or which may hereafter be enacted, the state of California hereby consents to said act; and the said company, its successors and assigns are hereby authorized and empowered to change the line of its railroad so as to reach the eastern boundary line of the state of California by such route as the company shall determine to be the most practicable, and to file new and amendatory articles of association; and the right, power, and privilege is hereby granted to, conferred upon, and vested in them, to construct, maintain, and operate, by steam or other power, the said railroad and telegraph line mentioned in said acts of congress, hereby confirming to and vesting in the said company, its successors and assigns, all the rights, privileges and franchises, power and authority conferred upon, granted to, or vested in said company by the said acts of congress, and any act of congress which may hereafter be enacted."

Subsequent to the filing of said plat, on January 3, 1867, and prior to the issue of the patent to the land in question, the legislature of California passed various other acts recognizing and granting rights to the Southern Pacific Railroad Company. Under section 40 of the act under which plaintiff was incorporated, it was authorized to consolidate with any other railroad corporation. St. 1861, 622.

On October 12, 1870, in pursuance of the general statute, the San Francisco & San Jose Railroad Company, then owning and operating a road from San Francisco through San Mateo county to San Jose, in Santa Clara county, together with other companies, consolidated with the said Southern Pacific Railroad Company, taking the name of the main and principal company, the Southern Pacific Railroad Company, by which consolidation the Southern Pacific Railroad Company acquired the railroad extending from San Jose to San Francisco; thereby connecting its line as laid down on the plat filed with the commissioner of the general land-office with the city of San Francisco.

On April 15, 1871, in pursuance of the said general act of the legislature of California, approved March 1, 1870, the said Southern Pacific Railroad Company filed amended articles of association, which articles, among others, contained the following recitals: "Whereas, by an act of the legislature of the state of California, entitled 'An act relating to certificates of incorporation,' approved March 1, 1870, any corporation then organized, or thereafter to be organized, under the laws of the state of California, is authorized and empowered to amend its articles of association, or certificate of incorporation, by a majority vote of the board of directors or trustees, and by a vote or written assent of the stockholders representing, at least, two-thirds of the capital stock of such corporation; and, whereas, by a certain other act of the legislature of

the state of California, entitled 'An act to aid in giving effect to an act of congress, relating to the Southern Pacific Railroad Company,' approved April 4, 1870, to enable the said company to more fully and completely comply with and perform the provisions, requirements, and conditions of an act of congress of the United States of America, entitled ' An act granting land to aid in the construction of a railroad and telegraph line from San Francisco to the eastern line of the state of California,' approved July 27, 1866, and of all other acts of congress then in force, or which might thereafter be enacted, the said Southern Pacific Railroad Company, its successors and assigns, were authorized and empowered to change the line of its railroad, so as to reach the eastern boundary line of the state of California, by such route as said company might determine to be most practicable, and to file new and amendatory articles of association: * * * 'now, therefore, the board of directors of said Southern Pacific Railroad Company do order and direct that the articles of association of said company be amended so as to read as follows," etc. The object of the corporation as expressed in its amended articles is as follows: "Art. 2. The object and purpose of said new corporation shall be to purchase, construct, own, maintain, and operate a continuous line of railroad from the city of San Francisco, in the state of California, through the city and county of San Francisco, the counties of San Mateo, Santa Clara, Monterey, Fresno, Tulare, Kern, San Bernardino, and San Diego, to some point on the Colorado river, in the south-eastern part of the state of California, a distance of seven hundred and twenty miles, as near as may be; also, a line of railroad from a point at or near Taheechaypah pass, by way of Los Angeles, to the Texas Pacific Railroad, at or near the Colorado river, a distance of three hundred and twenty-four miles, as near as may be; also, a line of railroad from the town of Gilroy, in the county of Santa Clara, in said state, passing through said county, and the counties of Santa Cruz and Monterey, to a point at or near Salinas City, in said last-named county, a distance of forty-five miles, as near as may be; also, such branches to said lines as the board of directors of said new corporation may hereafter consider advantageous to said corporation, and direct to be established."

The road having been constructed through the county of Tulare on the line designated in said plat filed with the commissioner of the general land-office, January 3, 1867, and on the line described in said amended articles of association, a patent to the lands in question was issued to said plaintiff, the Southern Pacific Railroad Company, in the usual form in such cases, on October 20, 1877, but said patent did not contain any clause "expressly saving and reserving all the rights of actual settlers," prescribed in said joint resolution of congress, passed June 28, 1870. The said lands are situated in the county of Tulare, within the 20-mile limit as the line is designated on said plat filed with the commissioner of the general land-office, and adjacent to the completed portion of the road.

The defendant, Orton, who possessed all the statutory qualifications required to entitle him to pre-empt a portion of the public lands, with his family, settled upon the tract in question, with a view to pre-empt it, on November 1, 1869, where he has ever since resided and cultivated the same, performing the requisite acts to acquire a pre-emption right, if said land was at the time of his entry, or at any time afterwards, subject to pre-emption. On June 5, 1870, he offered to file a pre-emption claim on the land, but his offer was rejected by the officers of the land-office. On September 5, 1878, since the issue of plaintiff's patent, he repeated his offer, and a hearing having been had by order of the secretary of the interior, the register and receiver rendered a decision in his favor, from which plaintiff appealed, and the appeal is still pending.

*Lake & McKoon*, for plaintiff.

J. Jacobs, Jr., and L. H. Van Schaick, for defendant.
Before SAWYER, Circuit Judge.

SAWYER, J., (after stating the facts.) This case has been argued with great ability by the counsel on both sides. It presents a question of great importance, as upon the decision of the points raised by defendant apparently depends the validity of the entire land grant made by congress to aid in the construction of the Southern Pacific Railroad under the act of 1866. If some of the points made are tenable, then, the legislature of California, and the United States congress, both in their original and subsequent legislative action; the officers of the Southern Pacific Railroad Company, and those who have purchased the granted lands from the company, and those who have purchased the bonds of the company secured by these lands,—have all been mistaken as to the rights of the plaintiff derived under these various acts. Under the circumstances, there, certainly, ought to be a very clear case to justify a court in annulling all the rights hitherto supposed to have been acquired by the plaintiff, and those claiming under it in these lands.

The points relied upon by defendant's counsel, as stated in their own language, are as follows: (1) "That the grant was confined to lands along the line of its lawful route [the lawful route of the road] as fixed by its articles of association (articles incorporating the company) and the laws of California." (2) "That the route indicated by the map filed in the general land-office on January 3, 1867, and upon which the road is thus far constructed, is without authority of law, and that the grant has not, and cannot attach to lands along that route." (3) "Conceding, for the purposes of the argument, that the route of January 3, 1867, at first unlawful, was subsequently made lawful by the act of the legislature of California of April 4, 1870, and the grant was floated to such new route by the joint resolution of congress of June 28, 1870; yet, by that joint resolution the land in question was excepted from the grant, and that the patent, failing to save or reserve the defendant's rights to this land, is issued contrary to the provisions of the joint resolution, and is therefore void."

The first point, then, is, that the land in question does not lie on the line intended by the act of congress making the grant, and is, therefore, not within the grant. In the development and argument of this point it is said, in substance, that congress found a corporation existing under the laws of California, which had adopted in its articles of association a certain line on which it was authorized to construct a road; that it had authority to construct a road on that line, and no other; that its rights must be presumed to have been known to congress, and it must be presumed that congress intended to make its grant along the line indicated in its articles of association, and no other; that the route generally indicated was from a point on the bay of San Francisco, "through the counties of Santa Clara, Monterey, San Luis Obispo, Tulare, Los Angeles, and San Diego, to the town of San Diego; thence, through the said county of San Diego, to the eastern line of the state of California, there to connect with a contemplated railroad from the said eastern line of the state of California to the Mississippi river;" that this was the line upon which the Southern Pacific Railroad Company was, at the time of the passage of the act, authorized to build a road under the laws of California, and of its organization; and that congress contemplated, and could have contemplated, no other line. I agree with counsel, that congress must be presumed to have passed the act in question with full knowledge of the laws of California under which the Southern Pacific Railroad Company was organized, and of the extent of the authority of the company under its organization. And the intention of congress in making the grant must be ascertained from the language of the act in view of this presumption; that is to say, we must construe the

act in the light of the circumstances existing at the date of its passage relating to the subject-matter of the act; but the intention must be derived at last from' the language of the act itself, thus considered. There was but one Southern Pacific Railroad Company to which the grant was made; and the *grantee* named in the act of congress is "the *company* incorporated under the laws of the state of California," not the *road*, or the *line of road* to be built by the company. And it was "authorized to connect with the Atlantic & Pacific Railroad, formed under this act, at such point near the boundary line of the state of California as they shall *deem most suitable for a railroad to San Francisco.*"

Now, what was the manifest intent of this provision? Obviously to have a road from the point of connection to San Francisco, and the point of connection most suitable for constructing a road therefrom to San Francisco was left to the judgment and discretion of the company,—"such point * * * *as they shall deem* most suitable for a railroad line to San Francisco." It was left to the company, then, by this provision of the statute, to designate the *point* of connection within the limits, and the *line also;* but another provision to be referred to is more specific on the latter point. It is manifestly the intention from this language, if taken by itself, to have a road from the point of connection to San Francisco by the route stated. This intention becomes more apparent by considering other provisions. The Atlantic & Pacific road, by section 1 of the act, was to run "along the *thirty-fifth parallel of latitude,* as near as may be found most suitable for a railway route to the *Colorado* river at such point as may be selected by said *company for crossing;* thence by the most practicable and eligible route *to the Pacific,*"—not to San Francisco. Congress could not have intended the Southern Pacific Railroad Company to build a road to the Pacific merely, as the Atlantic & Pacific was authorized to do that by a direct route; but a road to connect the Atlantic & Pacific road at some point near the place of crossing the Colorado river, which is the eastern line of the state, by the most suitable line with San Francisco. It would be absurd to suppose, in view of the language used, and the provision for extending the Atlantic & Pacific Railroad directly to the Pacific, that congress contemplated the building by the Southern Pacific Company a railroad from the point of connection near the thirty-fifth parallel, a hundred miles south, and some two hundred or more miles to San Diego, at which point, when reached, the road would be as far from San Francisco as from the point of connection whence it started.

San Francisco being the objective point, it could be reached from many points on the Atlantic & Pacific road by lines several hundred miles shorter than from the point of connection near the intersection of the thirty-fifth parallel of latitude and the Colorado river, by the way of San Diego. So, also, upon defendant's own theory, this construction of the language is inadmissible, for it is insisted that congress could not have intended to grant lands along a line not specified in the articles of incorporation of the Southern Pacific Railroad Company. If this be so, then congress could not have intended to make any grant at all, for the general line specified in the articles would not touch either point mentioned in the act,—either the point of intersection near the Colorado river, or San Francisco. The line specified in the articles of association is through the county of "San Diego to the town of San Diego in said state; *thence eastward through the said county of San Diego,* to the eastern line of the state of California." The town of San Diego is in the south-western angle of the state, and a line from the town of San Diego "eastward through the said county of San Diego" would strike the Colorado river in the extreme south-eastern corner of the state, where the Texas Pacific Railroad is now to cross the river, and more than two degrees of latitude south from the point of connection named in the act, near the point where

the thirty-fifth parallel of latitude crosses the state line.    The county of San Diego embraces about the same extent of territory as the three states of Massachusetts, Connecticut, and Rhode Island, and the county of San Bernardino is considerably larger, yet there is no point of the county of San Diego that is within less than a degree of latitude of the point of connection named in said act of congress near the intersection of the eastern line of the state and the thirty-fifth parallel of latitude; the said point being in the county of San Bernardino, through which it would be necessary for a line of road to run many miles away from San Francisco before it could possibly touch the county of San Diego at all; and the articles of association do not mention the county of San Bernardino as one through which the proposed road is to extend.    A line of road from any point on the bay of San Francisco, following the route indicated in the articles of association, through Los Angeles and San Diego counties to the town of San Diego, thence *easterly* through the latter county to the Colorado river, could not at any point be within two degrees of latitude of the point near the intersection of the thirty-fifth parallel of latitude and the Colorado river, or eastern line of the state.

So, also, to reach San Francisco a road would necessarily pass from Santa Clara county through the county of San Mateo and the city and county of San Francisco, or the county of Alameda; neither of which counties is mentioned in the articles of association, nor is San Francisco mentioned in the articles as a point to or from which the road is to extend.    The Southern Pacific Railroad Company thus far had no better authority under its articles of association for constructing its road from the designated point of intersection to San Francisco by the route which defendant's counsel insisted it should have followed, than by the route adopted in the plat filed.    There would be quite as great a deviation from the route claimed by defendant to be the only one that could be pursued, and quite as much unauthorized road to be constructed, as by the route actually adopted.    In fact, upon defendant's theory, the Southern Pacific Railroad Company could have constructed no road at all which would have entitled it to the benefit of the grant, and the grant was entirely nugatory.    The object of the grant undoubtedly was to secure a line of railroad from a point on the Atlantic & Pacific Railroad, designated as near the line of the state of California, and which road was to cross the state line as near as practicable to the thirty-fifth parallel of latitude to San Francisco, and, upon defendant's theory, the grantee was not authorized to build any road for a long distance on each end of the line which congress desired to have built, and the construction and use of which formed the sole consideration of the grant.

The fact, then, that the line adopted does not pass through San Luis Obispo and San Diego counties, to the town of San Diego, and thence easterly through San Diego county to the Colorado river, affords no reason for supposing that congress intended to adopt the absurd route of running a hundred miles or more south and away from San Francisco, then by a roundabout way return, in order to secure a railroad line to San Francisco from the point of intersection designated in the act; especially when it made the grant along the line from the point indicated, which the grantee itself "shall deem most suitable for a railroad to San Francisco." There can be no reasonable doubt, therefore, whatever the effect upon the rights of the parties, or whether the purpose was accomplished or not, that congress intended the Southern Pacific Railroad Company to construct a line of road from the Atlantic & Pacific Railroad line, as indicated in the act, at a point in California near the point of intersection of the thirty-fifth parallel of latitude with the eastern line of the state, by the most direct and feasible route to San Francisco; that the question as to which is the most direct and feasible route was left to the company; and that the lands granted are lands lying along said route to be so determined.    That the grantee was to locate the line between the points des-

ignated is also provided for in section 3 of the act of congress; which section, and all others of the act specifying the rights granted, is applicable to the Southern Pacific Railroad Company as well as to the one created by the act, and is to be read with reference to this part of the line as though the words "Southern Pacific Railroad Company" were substituted for "Atlantic & Pacific Railroad Company" in the section. It grants the odd sections "on each side of said railroad line as *said company may adopt*, * * * whenever on the line thereof the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption or other claims or rights, at the time *the line of said road is designated by a plat thereof*, filed in the office of the commissioner of the general land-office." On January 3, 1867, the Southern Pacific Railroad Company filed its plat in pursuance of these several provisions of the act, and the line laid down on the plat ran in a nearly direct line—as direct, doubtless, as practicable—from the supposed point of intersection near the eastern boundary of the state towards San Francisco, to Santa Clara county, where it intersected the San Francisco & San Jose Railroad, which extended to San Francisco, and along the route deemed most suitable by the company.

There can be no doubt, therefore, that the line adopted is the one contemplated by the act of congress, and the odd sections on each side of it are the lands actually contemplated by the congressional grant. If the grant was not effectual, then, it was because of an incapacity then, or at any future time, in the company to receive a grant which should in fact vest the legal title; and if the incapacity to receive a grant along this line existed then, as we have seen, for the same reason, it was incapable of receiving any grant under this act as it actually passed, along *any line* it might have adopted, and the grant was futile. At the date of filing the plat no pre-emption or other right had attached to the lands in question, and they were, therefore, subject to grant, and were impressed with every right, restriction, or effect which resulted from the operation of the act, whatever they might be. In section 6 it is provided "that the president of the United States shall cause the lands to be surveyed for forty miles in width on both sides of the entire line of said road *after the general route shall be fixed*, and as fast as may be required by the construction of said railroad; and the odd sections of land hereby granted shall not be liable to sale, entry, or *pre-emption before or after* they are surveyed, *except by said company as provided in this act;* but the provisions of the act of September, 1841, granting pre-emption rights, and acts amendatory thereof, and of said act entitled, 'An act to secure homesteads to actual settlers on the public domain,' * * * shall be, and the same are hereby, extended to *all other* lands on the line of said road *when surveyed*, EXCEPTING *those hereby granted to said company*." Instantly upon the filing of the plat, the odd sections within the prescribed limits on each side of the line indicated became affected by these provisions; and the statute itself, *proprio vigore*, withdrew them from sale, entry, or *pre-emption except by the company*. From that time forth to the present time, no man could acquire a pre-emption right, because it was expressly prohibited by the statute, and these provisions of the statute have never yet been repealed or modified. And this is so, whether the grantee was capable of receiving title or not.

The withdrawal is not made to depend upon the capacity of the grantee to take, or upon the grantee's performance of the conditions subsequent, so as to perfect the title, but it is absolute, without conditions, upon the performance of certain designated acts, which were in fact actually performed. The reason for withdrawal, doubtless, was to secure the construction of the road, but there was no provision for restoration of the lands to their former condition in case the object failed. That was left for future consideration by congress. In this act there is not even the provision usual in other acts granting

lands for public improvements, that in case of failure to perform the conditions subsequent the lands shall revert to the United States; but the subject is not overlooked, as there is a substitute for such provision in the ninth section, which provides "that if the said company make any breach of the conditions hereof, and allow the same to continue for upwards of one year, then, in such case, at any time hereafter, the United States may do any and all acts and things which may be needful and necessary to insure a speedy completion of the road." It does not provide that the lands shall be open to sale or preemption in case of a failure to complete the road. The United States by the act has devoted these odd sections to a construction of the contemplated road; and if the grantee fails to complete it for any cause, whether through incapacity to do it or otherwise, the government reserves to itself the right to take such other action as it may, upon consideration of the circumstances, deem needful to accomplish the purpose. If the title did not pass to the intended grantee, it might grant the land to other parties for performing the same service. At all events, they have been devoted to that object, and withdrawn absolutely and without conditions from any other disposition. There is no provision requiring the secretary of the interior to issue any order withdrawing them; the act itself has that operation by its own force. The order was, doubtless, proper as a matter of information to those seeking pre-emption locations, so that they might not ignorantly or recklessly settle upon these lands, in which they could acquire no rights, but it is without legal effect. Mr. Justice MILLER in *Knevals* v. *Hyde,* 20 Alb. Law J 371.

So there is no authority anywhere in the act for the secretary of the interior to revoke the withdrawal, or restore the lands to market, or subject them to pre-emption. His various orders were nullities, as he had no authority whatever to repeal or modify the act of congress, expressly withdrawing these lands from pre-emption, or other disposition. Besides, his orders never took effect, for each was revoked or suspended before the time appointed for it to go into operation arrived. As the defendant entered upon these lands after the filing of the plat, and the statutory withdrawal, he was a naked trespasser without right, and without the ability to acquire any right from that day to the present, whether the grantee in the act had the capacity to acquire any right or not, and the question may be considered without feeling any embarrassment on account of any right of his, for he is wholly without any, whatever the rights of the railroad company may be. He is a total stranger to the title. But as the plaintiff must recover, if at all, upon its own right, and not on the want of any right in the defendant, it is still necessary to determine whether it is in a position to maintain this action, notwithstanding the total absence of any right to the land in defendant.

This brings us to the second point made by defendant,—that the grant along the line indicated in the plat is without authority of law, and did not, and could not, attach to the lands there situated; that is to say, that by the laws of California the grant could not attach to the lands, whatever the intent of congress, as the company was not authorized, by the statute under which it was organized, to construct a road along that line, for the reason that it was not indicated in its articles of association.

The Southern Pacific Railroad Company was a corporation duly organized. It was a railroad corporation organized expressly to build a railroad, and a railroad extending from the bay of San Francisco in a south-eastern direction to the eastern boundary of the state, intended ultimately to connect with some transcontinental road which it was supposed would be built at no distant day; but at what point it would enter the state was unknown, and, consequently, the point of the state line which the company desired to reach could not be definitely fixed. It was authorized to receive lands by gift, grant, purchase, or otherwise, for the purposes of its road, and to aid in its construction, with-

out limitation as to amount or location. These facts are undisputed. Congress found this corporation thus organized for the purposes, and with the powers, indicated, and made a grant of land to it for the purposes, and on consideration that it should accept the terms, and build a road along the line before indicated; which grant and the conditions were actually accepted, and the road was in fact built according to the' conditions of the grant, to entitle it to a patent for the land in question, provided it was capable of receiving the grant. The line of the road adopted, also, started at the point indicated in the articles of association, and ran in a south-easterly direction through the state to its eastern line, to connect with a road to the Mississippi river, the general line of which latter road had in the mean time been fixed, and it ran in the general direction through all the counties, including the one in which the lands are situated, named in the articles of association, except San Luis Obispo, which was left to westward, and the county of San Diego, which was further south, and the line adopted turned to the eastward before reaching it; the general object and purpose of the line finally definitely located and adopted being the same as that expressed in the articles of association.

The question in this case, as in many others, to place it in the strongest light for defendant, is one of doubt as to whether the corporation exceeded its original powers, or abused its *corporate* franchise. It was empowered to receive grants of lands for proper purposes, and the question is, whether the building of the road, as actually built, is the proper purpose. It is not like a corporation without capacity, and positively forbidden by the statute to take lands at all for any purpose. It was competent to take and hold lands for some purposes, and the settled rule in cases like this, is that strangers cannot litigate the question. It is a matter between the state and the corporation. The company had the physical capacity to perform, and it has performed, in fact, whether rightfully or not, its part of the contract, and the United States is satisfied, and has issued its patent in pursuance of the terms of the act. The United States has done all in its power to vest the title in the company. The state has not complained of any misuse or abuse of the corporate powers of the company   All parties in interest being satisfied, strangers cannot complain.   The authorities settle this question.

In *Mining Co.* v. *Virginia & G. H. W. Co.*, 1 Sawy. 478, I had occasion to consider an analogous question, and said. "By express provisions of statutes, corporations are usually limited in their purchases of real estate; for instance, to such as are actually necessary to the exigencies of their business. But suppose a much larger amount should be conveyed to a corporation than it was authorized to take, it would not be contended, I apprehend, that a trespasser, who had taken possession of a portion of such *excess* of land, could successfully set up a want of capacity in the corporation to take, as a defense to an action of ejectment by the corporation. As between the party despoiled and the wrong-doer, the courts will not enter upon the inquiry." And I cited the following authorities which sustain the position: *Bank* v. *Railroad Co.*, 17 Wis. 372; *Glass Co.* v. *Dewey*, 16 Mass. 94, 102; *Mining Co.* v. *Baker*, 3 Nev. 391; *Mining Co.* v. *Clarkin*, 14 Cal. 552. The court says, in 3 Nev. 391, after discussing the question: "A deed then, to a mining corporation is not void upon its face. If they have violated the law, in taking a greater quantity of land than is allowable, then they have committed a wrong, not against any particular individual, but against the whole community, and this wrong can only be inquired into by a proceeding on the part of the state. Their deed to the land, if they buy from one having title, or their possession, if they only derive title from occupation, *gives them a right to hold against all the world except the state.*" In *Mining Co.* v. *Clarkin*, 14 Cal. 552, Mr. Chief Justice FIELD, speaking for the court, says: "Whether or not the premises in controversy are necessary for these purposes, [of the corporation,] it is not

material to inquire; that is a matter between the government and the corporation, and is no concern of the defendants. It would lead to infinite inconveniences and embarrassments, if, in suits by corporations to recover the possession of property, inquiries were permitted as to the necessity of such property for the purposes of their corporation, and the title made to rest upon the existence of such necessity. See *Bank* v. *Poitiaux*, 3 Rand. (Va.) 136, and Ang. & A. Corp. §§ 113–121." [1] To the same effect are *Telegraph Co.* v. *Telegraph Co.*, 22 Cal. 429, 430; *Railroad Co.* v. *Proctor*, 29 Vt. 93; *Bissell* v. *Railroad Co.*, 22 N. Y. 259; *People* v. *Society*, 1 Paine, 653; *Bank* v. *North*, 4 Johns. Ch. 371; *Terrett* v. *Taylor*, 9 Cranch, 51, 52; *Kneval's* v. *Hyde*, 20 Alb. Law J. 371.

Numerous other cases might be cited to show that whether a corporation has violated its charter by misuse or abuse of its corporate franchise by usurpation of powers, is a question between it and the state alone, to be inquired into on a direct proceeding for that purpose. The same principle is recognized by the United States supreme court in *Schulenberg* v. *Harriman*, 21 Wall. 62. In discussing the mode by which a present grant to land by the government to the state of Wisconsin to aid the construction of a railroad, becomes attached to specific land by a location of the road, Mr. Justice FIELD, speaking for the court, said: "No individual can call in question the validity of the proceedings by which precision is thus given to the title, when the United States are satisfied with them." Again, on page 63, speaking of failure of title for breach of condition subsequent: "And the same doctrine obtains where the grant upon condition proceeds from the government; no individual can assail the title it has conveyed on the ground that the grantee has failed to perform the condition annexed." See, also, *U. S.* v. *Repentigny*, 5 Wall. 267, 268.

The state of California and the United States being satisfied with the acts of the plaintiff in respect to the use of its franchise, the grant, and construction of the road, the defendant, a mere stranger, without any interest whatever, cannot raise the question relied on in this point.

But by holding that defendant is not in a position to attack the validity of the grant on this point, I do not mean to cast any suspicion upon the validity of plaintiff's title upon the facts herein stated, even if the question could be raised by defendant and determined in this action. Considering the vast interests involved, and the number of persons who must have become interested as purchasers from the plaintiff, and in securities resting on the plaintiff's title, I do not feel at liberty to leave the case on that point alone. I may be wrong in the conclusion reached; and the point made on the validity of the title is presented by the record, and must be determined if the defendant turns out to be entitled to urge it; and it has been fully argued and relied on by counsel for the defense. I shall, therefore, proceed to decide it as one of the points in the case.

In my judgment, the title of the plaintiff is valid, and, so far as it can be done in this action, the question ought to be determined and finally set at rest. As before stated, the object of congress in making the grant was to secure a railroad from a point in Missouri already having eastern connections, through the states of Missouri and northern Texas, the territories of the United States, and the state of California to the Pacific ocean, with a branch extending from the point designated near the eastern line of the state of California to San Francisco, which road could be used by the government for the purposes and upon the terms specified in the act, among which were that it was to be a postal and military road. The act authorizes the corporation created by it

---

[1] Affirmed in Cowell v. Springs Co., 100 U. S. 60, 61, decided since the decision of this case; also Christian Union v. Yount, 101 U. S. 361.

to construct portions of its road through three different states, without any provision for procuring authority from, or the consent of, the respective states. If congress has power to create a corporation with such authority, it is, doubtless, found in those provisions of the constitution relating to the regulation of commerce among the states, its war power, its control over postal matters, and other cognate powers. If congress can create an instrument and confer upon it such authority without consent of the states, it would seem that it might select an instrument already created by a state, and confer upon it such additional powers and authority, if any are required, as may be necessary to effect the same objects. If it could confer the authority upon a corporation of its own creation, it could confer it upon a natural person, and why not upon a state railroad corporation? However this may be, congress in making this grant must be presumed to have been familiar with the organization and powers of the Southern Pacific Railroad Company, and to have made the grant in question with full knowledge of the situation, and the grants were made upon the condition subsequent of building the road. To ultimately perfect the title, it was necessary for the grantee to do everything necessary to complete the road, and, if the procurement of additional powers from the state was essential to that object, then it was as necessary to procure those powers in some proper mode, as to do any other essential act; and, whether necessary or not, the legislature of California did in fact pass the act of April 4, 1870, mentioned in the statement of facts, authorizing said company to change the line of its road if necessary, and authorizing it to construct and maintain the road provided for in said act of congress. If, therefore, there was before a want of such authority, it was given by this act, provided the act itself in these particulars is constitutional.

But it is insisted that this act was passed in violation of the provisions of section 31 of article 4 of the constitution of California, which reads: "Corporations may be *formed* under general laws, but shall not be *created* by special act, except for municipal purposes." After a careful consideration of the question, I am myself unable to perceive wherein that portion of the act, at least, which authorizes the company to change the line of its road, and to accept the grant made by and to build the road provided for in the act of congress, is in contravention of this provision of the constitution. It is unnecessary to consider the provision of this act authorizing the corporation to file amended articles of association, for, if that be conceded to be in excess of the legislative power, it can be separated from the others, and does not vitiate the other provisions. I do not perceive that any amendment of the articles was necessary, for the corporation was already formed or created,—was already in existence, with all the essential faculties that go to make up a corporation for building a railroad; and the act authorizing the change of line and acceptance of the congressional grant, with its conditions, only granted to an existing person permission to do a thing which had **no** necessary relation to the *corporate* grantee, and was not at all essential to the existence of the legal entry created by law, or to any other person, natural or artificial. But if an amendment to the articles was necessary, it was already authorized and provided for by the prior act of March 1, 1870; and it was not necessary to repeat the authority in this act; and the act of March 1 is a *general* act, and, therefore, not obnoxious to the objection urged against the said act of April 4, 1870. The settled rule of construction of state constitutions is that they are not special grants of power to legislative bodies, like the constitution of the United States; but general grants of all the usually recognized powers of legislation not actually prohibited or expressly excepted. In the language of Mr. Justice SHAFTER in *Bourland* v. *Hildreth*, 26 Cal. 183: "The constitution is not a grant of power, or an enabling act to the legislature. It is a limitation on the general powers of a legislative character, and restrains only so far as the

restriction appears either by express terms or by necessary implication; and the delicate office of declaring an act of the legislature unconstitutional and void, should never be exercised unless there be a clear repugnancy between the statute and the organic law." See, also, Id. 215, 225, *et seq.; People* v. *Sassovich*, 29 Cal. 482; *Railroad Co.* v. *City of Stockton*, 41 Cal. 161. And it is equally well settled that the *exception* must be *strictly* construed. In the language of Mr. Chief Justice WALLACE in the last case cited: "The construction is '*strict* against those who *stand upon the exception;* and *liberal in favor of the government itself.*'" Id. 162. And in *Sharpless* v. *Mayor of Philadelphia*, 21 Pa. St. 160, Mr. Chief Justice BLACK said upon the same subject: "The federal constitution confers powers expressly enumerated; that of the state contains *a general grant of all* powers *not excepted.* The construction of the former instrument is strict against those who claim under it; the interpretation of the latter is strict *against* those who *stand upon the exceptions*, and liberal *in favor of the government itself;* the federal government can do nothing but what is authorized expressly, or by clear implication; the state *may do whatever is not prohibited.*"

The authorities establishing this canon of construction are numerous, and, so far as I know, uniform. Bearing this rule of construction in mind, what does the constitutional prohibition relied on mean? The only prohibitory words are, that corporations of the class in question "shall not be *created* by special act." The word "create," has a clear, well-settled, and well-understood signification. It means to bring into being; to cause to exist; to produce; to make, etc. To my apprehension, it appears to be one thing to create, or bring into being, a corporation, and quite another to deal with it as an existing entity, a person, after it is created by regulating its intercourse, relations, and acts as to other existing persons, natural and artificial. "A corporation is a franchise possessed by one or more individuals, who subsist as a body politic, under a special denomination, and are vested, by the policy of the law, with the capacity of perpetual succession, and of acting in several respects, however numerous the association may be, as a single individual." 2 Kent, Comm. (9th Ed.) 306; *Railroad Co.* v. *Commissioners*, 112 U. S. 609, 5 Sup. Ct. Rep. 299. The ordinary incidents to a corporation are to have perpetual succession, and the power of electing or otherwise providing members in the place of those removed by death or otherwise; to sue and be sued; to grant and receive and to purchase and hold lands and chattels by their *corporate name;* to have a common seal; to make by-laws for the government of the corporation; and sometimes the power of amotion or removal of members. "The essence of a corporation consists only of a capacity to have perpetual succession under a special denomination, and an artificial form, and to take and grant property, contract obligations, and sue and be sued by its corporate name, and to *receive and enjoy in common* grants of privileges and immunities." Id. 325.

The creative act necessarily extends only to the bringing into being of an artificial person, with the capacities stated, among which is "a *capacity* to receive and enjoy in common grants and privileges and immunities;" that is to say, a capacity to receive and enjoy such grants, privileges, and immunities as may be made either at the time of the creation or any other time. The creation of the being with the capacity to receive grants is one thing; the granting of other privileges and immunities, which it has the capacity to receive when created, is another. When such a being is brought into existence, a corporation has been created. A legal entity, a person, has been created, with a capacity to do by its corporate name such things as the legislative power may permit, and receive such grants of such rights and privileges, and of such property, as the legislature itself or private persons with the legislative permission may give. But I do not understand that every

right, privilege, or grant that can be conferred upon a corporation, must be given simultaneously with the creative act of incorporation.  On the contrary, I suppose the artificial being must be created with a capacity to receive before anything can be received.  The right to be a corporation is itself a separate, distinct, and independent franchise, complete within itself.  And a corporation having been created, enjoying this franchise, may receive a grant and enjoy other distinct and independent franchises, such as may be granted to and enjoyed by natural persons; but because it enjoys the latter franchises, they do not, therefore, constitute a part of the distinct and independent essential franchise,—the right to be a corporation.  They are additional franchises given to the corporation, and not parts of the corporation itself,—not of the essence of the corporation.  Natural persons, with certain physical capacities, being brought into existence through the processes appointed by nature, may be prohibited by law from doing one thing, and permitted to do another; may enjoy one franchise, and be excluded from the enjoyment of another; but these permissions and prohibitions constitute no part of the person, and were in no manner connected with the creative act.  So, with reference to corporations, being once created, they have the physical capacity, through their officers, to do anything that a natural person may do; such as building a church, a steamship, or a railroad.  But, being created, they may be prohibited from doing one thing and permitted to do another, like natural persons; but this permission or prohibition is not a creative act, but an act regulating the conduct of the corporation, and determining its rights and relations to the public, and to other existing persons, natural and artificial.  *Corporate* powers, strictly speaking, I suppose, are those peculiar and essential to a corporation,—not those which are or may be possessed in common with natural persons; and they are very few in number, embracing those which pertain to the essence of the corporation.  The term is, undoubtedly, often and conveniently used in a broader sense, but it is not found in the constitutional provision in question.  Section 33, art. 4, defines the term "corporation," as used in the constitution, and says it "shall be construed to include all associations and joint-stock companies having *any of the powers of corporations not possessed by individuals or partnerships.*"  Of course, it excludes all associations that do not have any powers other than those possessed by individuals and partnerships.  And this provision is a recognition of the idea that *corporate* powers are only such as are not possessed in common with individuals and partnerships,—or natural persons.  The power to create a corporation, as the terms are used in section 33, extends, therefore, to the bringing into being of a legal entity, having powers and privileges not possessed by individuals; that is to say, possessing the powers, which, as before stated, constitute the essence of a corporation, or corporate powers, strictly speaking, and has no reference to the legislative dealings with that artificial person after its creation.  I suppose the constitution might have devolved the power of creating a corporation on some other body, as the supreme court, and the power to deal with it after its creation—to regulate its conduct and relations to the public, and to prescribe its rights, powers, and duties, other than those strictly corporate, to the legislature.  Had it been so provided, there can be no doubt that such powers would have been wholly distinct and independent.  I do not perceive that they are any the less so, because exercised by the same body.  The act of creating a corporation by conferring upon an association of individuals certain strictly corporate powers, embracing only powers and privileges not possessed by individuals and partnerships, and then granting to it other privileges, enlarging or restricting its right to the enjoyment of other franchises that may be possessed in common with natural persons, and regulating its external relations, are, to my mind, distinct and independent, and I find nothing in the constitution prohibiting the latter power to the legislature.  There are numerous distinct, independent franchises, any one or more of

which may be granted indifferently either to natural persons or existing corporations, and, in my judgment, the constitution no more prohibits the granting of any one of those franchises, except such as are expressly prohibited to corporations by special act, than to individuals. It only prohibits the *creation* of a corporation by special act; that is to say, that the creating or granting of the *particular franchise constituting* a corporation shall not be by special act. The prohibition applies to no other of the numerous franchises which are subjects of legislative grant.

In this case there was a corporation,—a railroad corporation,—duly created under the general act, for the purpose of building a railroad in a south-eastern direction through the state of California to the eastern line of the state, to intersect with a road which it was supposed would soon be built to the eastern states, the route of which was still undetermined and uncertain. It had all the faculties physically necessary to enable it to build any railroad. Afterwards congress authorized the building of a road across the continent on or near the thirty-fifth parallel of latitude to intersect the line of the state at a point different from that designated in the articles of association of said corporation, and made a grant to the corporation on condition that it should build a road from a point of intersection with said transcontinental road, near the eastern line of the state, to San Francisco, and the legislature, by special act, authorized the said corporation already in existence with authority and capacity to build a railroad, to build its road upon said line, and accept and receive said grant. In my judgment this is in no sense an act creating a corporation, or a new corporate power, or new corporate franchise within the proper meaning of the term, but a dealing with a corporation already in existence authorized to build a road in the same general direction, with the same object in view; that the change of line was a matter of detail only, and if not, but on the contrary, the grant of an independent right, and an additional privilege or franchise, it was still one entirely competent for the legislature to confer upon the existing corporation, as well as on any natural person, and in no way obnoxious to the provision prohibiting the creation of a corporation for such purpose by special act. To reach any other conclusion would be to violate the canon of constitutional construction before stated; to disregard the plain meaning of the terms used in the constitution, and upon imaginary grounds interpolate into that instrument language which the people have not seen fit to place there themselves. As said, in substance, by Mr. Justice CROCKER in *Telegraph Co.* v. *Telegraph Co.*, 22 Cal. 425, to give the constitution any such construction as claimed, we would have to make it read thus: "Corporations may be formed, *and other franchises and special privileges granted*, under general laws, but shall not be created, nor shall *other franchises or special privileges* be granted by special act, except for municipal purposes." He well remarks: "If such had been the meaning intended by the framers of the constitution, they could easily have expressed it in apt words. The language used by them is clear, and they well knew that it included *but one* of the numerous class of franchises the subject of legislative grant, and that a regulation of *one* could not by any reasonable implication be extended to others *not mentioned.*"

The constitution descends to particulars when it is necessary to express the intent of its framers, as in section 34, which reads as follows: "The legislature shall have no power to pass any act granting any charter for banking purposes; but associations may be formed, under general laws, for the deposit of gold and silver; but no such association shall make, issue, or put in circulation any bill, check, ticket, certificate, promissory note, or other paper, or the paper of any bank, to circulate as money." There is no restriction upon the legislative power to grant the right to build railroads and other privileges and franchises to natural persons, and our statutes are full of such grants.

As examples, see railroad grants, St. 1862, pp. 97, 295, and St. 1878–79, 698, 841. There would seem to be no good reason for a prohibition of such grants to railroad companies once duly organized, when the same character of grants can be made *ad libitum* to natural persons.

The United States supreme court sustains these views in the recent case of *Wallace* v. *Loomis*, 97 U. S. 154, arising under a provision of the constitution of Alabama in the identical words of our constitution under consideration. A special statute of Alabama "authorized the Mills Valley Railroad Company, a pre-existing corporation, to purchase the railroad and franchises of the Northeast & Southwestern Railroad Company, another pre-existing corporation; and, after doing so, to change its own name to that of the Alabama & Chattanooga Railroad Company." This act was claimed to be in violation of the constitutional provision referred to, and Mr. Justice BRADLEY, speaking for the court, in overruling the point, says: "We are unable to see anything in this legislation repugnant to the constitutional provision referred to. That provision cannot simply be construed to prohibit the legislature from changing the name of the corporation, or from *giving it power to purchase additional property, and this was all it did in this case. No new corporate powers or franchises were created.*" See, also, *Bank* v. *De Ro*, 37 Cal. 540. The court must necessarily have taken the view as to what constitutes corporate powers and franchises maintained in this opinion. For it will not be denied that the power to purchase and own a railroad which a company was not before authorized to do, is a highly important one, and embraces highly important franchises; and, in fact, all the powers and franchises necessary to enable a corporation to build and own a railroad; and, if the power was not possessed before, it must be *new*. If they are not *corporate* powers and franchises when held and exercised by a corporation, it is because they are not peculiar to corporations, but such as may be granted to, possessed, and enjoyed by natural persons in common with corporations, or else that the granting of corporate powers and franchises to an existing corporation is not the creation of a corporation or a corporate power. This case clearly covers the case in hand; for if this right to purchase and enjoy another wholly different and independent road, and to change the name of the corporation, does not create a new corporate power, much less would the right to change the line of a road only generally indicated and not definitely located.

I should have contented myself with a simple reference to this authority, without any discussion of the question, but for the fact that defendant has cited the case of *San Francisco* v. *Water-Works*, 48 Cal. 493, decided by the supreme court of the state, in which it is held that corporations can exercise no powers except such as are conferred by the general laws under which they are formed, and that the legislature cannot confer on such corporations any powers, or grant them any privileges, by special act; which decision they claim to be controlling in this court, notwithstanding the decision of the United States supreme court upon a like provision in the constitution of another state to the contrary. It is true that the *settled* construction of the provision of a state constitution by the highest court of the state, not in conflict with any provision of the constitution of the United States, will be adopted and followed by the national courts, whatever their opinion as to the correctness of the settled construction may be. It becomes necessary, therefore, to consider whether the decision cited is within the rule invoked. In my opinion, it is not. In 1863, the same question arose in *Telegraph Co.* v. *Telegraph Co.*, 22 Cal. 398, and was elaborately considered. It was then held that the legislature might confer upon existing corporations by special act, a direct grant of special privileges and franchises; and that there was no restriction upon the power imposed by the constitution, except as to the particular privileges therein specified. The court was then composed of three justices, but

only two of them appear to have participated in the decision. This construction does not appear to have ever been questioned till the case of *San Francisco* v. *Water-Works*, which arose in 1874, 11 years afterwards. This case was vigorously and persistently contested on every point that the ingenuity of able counsel could suggest, yet, upon the *first* appeal, and upon the *first* hearing of the *second* appeal, the point was not even made, doubtless for the reason that the construction of the constitution was supposed to be finally settled. But, failing upon all other points, counsel obtained a rehearing, then raising and urging for the first time, seemingly as a forlorn hope, the constitutional point under consideration with the result before stated. At this time the supreme court was composed of five justices, of whom the chief justice, having been interested, took no part in the decision. Of the other four, three concurred, while the fourth delivered a vigorous dissenting opinion. Thus, of the six justices of the supreme court, who have considered the question, three took one view and three the other, so they stand in number equally balanced. The able and eminent justice who delivered the opinion of the court in the last case, for whose opinion I entertain profound respect, very ably presented the same views adopted in his opinion, in his argument as counsel in the former case, so that the court in the first case did not overlook, but on the contrary, fully considered, them. Had the justices who have passed upon the question in the two cases sat as one court, there would have been no decision of the question. Thus the matter stands equally balanced, the only difference as authority being that the decision against the constitutionality of the power is last.

The supreme court, as it will be hereafter organized, consists of seven members,—six justices and a chief justice,—who may be called upon to decide the point, only one of whom was a member when the former cases were decided. What view the new court may take of the question, of course, cannot now be known; but probably, under the circumstances, the justices will feel at liberty to consider the question as still unsettled, and upon further consideration to give effect to their own views, whatever they may turn out to be; especially so as the view adopted in the last case must invalidate a large amount of legislation, under which important rights must have become vested, had before the promulgation of the decision, if not some of the legislation since that time. Upon the strict doctrine of the last case, it would seem to be impossible to legislate at all by special act, so as to affect in any way any existing corporation; because, under the view of the court, any legislation at all must add to or take from its corporate powers and privileges, and to that extent modify its charter and create a new corporation. A construction resulting in so numerous and manifest inconveniences should not be adopted unless the language of the constitution clearly and imperatively requires it, and, unless clearly apparent, cannot be adopted without violation of the canon of construction before stated. If the construction given in the first case cited, acquiesced in for 11 years, did not become "settled," the second decision, under the circumstances, certainly cannot be regarded as setting the question at rest.

For these reasons, under the following authorities, I feel at liberty to adopt my own, and the views of the United States supreme court, which accord with the first case decided by the supreme court of California, and not with the second. *Insurance Co.* v. *Deboll,* 16 How. 431, 432; *Gelpcke* v. *City of Dubuque,* 1 Wall. 206. But this case falls within the principle decided in the two cases cited, as well as others, in another particular. The act in question was passed and acted upon by the railroad company four years before the decision in *San Francisco* v. *Water-Works,* and rights have become vested under it. During all that time it was the settled construction of the constitutional provision in question that such legislation was valid. The act, therefore, became a contract between the state and the company, under which the latter

entered upon the construction of its road in pursuance of the terms of the several statutes mentioned.

In the last case cited, the court, quoting from the opinion in the next preceding case, says: "The sound and true rule is, that if the contract, when made, was valid by the laws of the state, *as then expounded* by all the departments of the government and *administered in its courts of justice*, its validity and obligation cannot be impaired by any subsequent legislation, *or decision of its courts altering the construction of the law.* The same principle applies when *there is a change of judicial decision as to the constitutional power of the legislature to enact the law. To this rule we adhere. It is the law of this court. It rests upon the plainest principles of justice.* To hold otherwise would be as unjust as to hold that rights acquired under statutes may be lost by repeal. The rule embraces this case." 1 Wall. 206. And so it does the case now in hand.

The settled judicial construction of a constitutional provision, as well as of a statute, is regarded as incorporated into and becoming a part of the instrument itself. Says the supreme court of the United States: "The exposition of both [constitution and statute] belongs to the judicial department of the government of the state, and its decision is final and binding upon all other departments of that government, and upon the people themselves until they see fit to change their constitution, and this court receives such settled *construction as a part of the* FUNDAMENTAL *law of the state.*" *Webster* v. *Cooper*, 14 How. 504.

Upon the principle established by these cases, and many others that might be cited, the construction of the constitutional provision in question adopted in the *Telegraph Case*, in 22 Cal., became and continued a part of the fundamental law of the state for 11 years, till what in effect became, under these authorities, the judicial amendment in *Water-Works Case*, in 1874; and the act in question was valid at the time it was passed, and the rights acquired under it are not vitiated by the change in the *personnel* of the court, and the consequent change in the construction of the constitution. I, therefore, hold the act of April 4, 1870, authorizing the defendant to build its road upon the line indicated in the plat filed with the commissioner of the general land-office, and to accept the congressional grant, was a valid act, and at the time of its passage conferred the rights and powers indicated upon the Southern Pacific Railroad Company.

But, if mistaken in these views, the rights contemplated by the act vested in the company upon still another ground. We have seen by the preceding statement of facts, that on March 1, 1870, the legislature of California passed a *general* act authorizing "any corporation now or hereafter organized under the laws of this state" to amend its articles of association by filing new and amended articles in the same office in which the originals are filed. This power of amendment is unlimited except as provided in the act, none of which limitations affect the questions involved in this case. This is not a special, but a general act, and is applicable to all corporations. It has not even been suggested that there is any constitutional objection to this act, or that it is in any particular invalid. In pursuance of the provisions of this act, the Southern Pacific Railroad Company, on April 15, 1871, filed amended articles of association reciting the act, and also the said act of April 4, 1870, in which it declared its objects to be "to purchase, construct, own, maintain, and operate a continuous line of railroad from the city of San Francisco, in the state of California, through the city and county of San Francisco, the counties of San Mateo, Santa Clara, Monterey, Fresno, Tulare, Kern, San Bernandino, and San Diego, to some point on the Colorado river," etc.; also a line from Tahuchapa pass by way of Los Angeles to the Texas Pacific Railroad, and such branches as the board of directors might afterwards deem advantageous. These articles

cover the line embraced in the plat contiguous to the lands in question, and also a continuation from Tahuchapa pass to connect with the Texas Pacific Railroad, which in the mean time had been authorized by congress. So that the rights of the Southern Pacific Railroad Company, along the line contiguous to the lands in question, were perfected under this general act, and the amended articles of association, if not under the other act considered of April 4, 1870.

It only remains to consider the last point made upon the effect of the joint resolution passed by congress mentioned in the statement of facts. It is insisted that the closing paragraph of the resolution directing the issue of patents, "expressly saving and reserving all rights of actual settlers, together with the other conditions and restrictions provided for in the third section of said act," extended the exceptions of the grant which only embraced rights vested at the date of the filing of the plat, and protected all parties entering with intent to pre-empt after as well as before the filing of the plat, at least down to the date of the passage of the joint resolution, or to the date of the passage of the said act of April 4, 1870, authorizing the building of the road on the line indicated in the plat. I do not think the saving clause was intended to refer to any other settlers than those who were actual settlers before and at the time of the filing of the plat. Those settling subsequently could acquire no rights. Whatever may be the proper construction of this clause of the joint resolution, it cannot affect the rights of the parties. So far as the rights of the United States are concerned, the words of grant in the act of congress, "there be and hereby is granted," are words of present grant, and pass the title out of the United States—at least the equitable title—only to be defeated by failure to perform the conditions subsequent. The right to so much land vested at the date of the passage of the act, and attached to the specific land at the moment of filing the plat as provided in the act. This is thoroughly settled by a long line of decisions. *Schulenberg* v. *Harriman*, 21 Wall. 60; *Railroad Co.* v. *U. S.*, 92 U. S. 741; *Railroad* v. *Smith*, 9 Wall. 95; *Ryan* v. *Railroad Co.*, 5 Sawy. 262, 99 U. S. 383; *Railroad Co.* v. *Dyer*, 1 Sawy. 641; *Knevals* v. *Hyde*, 20 Alb. Law J. 370; *Van Wyck* v. *Knevals*, 106 U. S. 360, 1 Sup. Ct. Rep. 336.

After the right vested, congress itself could not affect it by legislation. It could only be divested by failure to perform the conditions and proper proceedings to revest the title in the government. These lands were absolutely and unconditionally withdrawn from pre-emption by the act of congress itself, *proprio vigore*, without any other act or notice, upon filing the plat, and the right to the land vested in defendant before the passage of the resolution. *Knevals* v. *Hyde, supra.* So, also, the act making the grant provided for the issue of patents "confirming" the title to the grantees without those conditions, and it was not in the power of congress by joint resolution to annex other conditions. Even if the right to the lands did not become perfect until the right to build the road was perfected by the said acts of the legislature of California, and the amendments of the articles of association, as before stated, the lands were protected from pre-emption claimants by the sixth section of the act of congress, so that the defendant could acquire no rights whatever upon which the saving clause could operate. The joint resolution, therefore, did not divest the title which had vested under the act of congress, and did not affect the rights of the parties. The object of the resolution seems to have been to relieve the doubts of the secretary of the interior as to what the rights of the company were,—a formal expression of congressional opinion. But if the clause be regarded as prescribed by law, its omission does not affect the patent so far as it is otherwise valid. The most that can be said is, that its omission does not vitiate any rights that ought to have been protected by its insertion. Those, like the defendant, who have no rights to protect, cannot complain of the omission.

It follows that the title to the lands in question is in the plaintiff, and the defendant has no title, and his possession is wrongful. There must be findings and judgment for the plaintiff, and it is so ordered.